***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioners and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representative; or amend the Opinion and Award except with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties prior to the hearing in a Pre-Trial Agreement and at the hearing as
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the Workers' Compensation Act and are properly before the North Carolina Industrial Commission.
2. The Commission has jurisdiction of the parties and of the subject matter. The employer-employee relationship existed between defendant-employer and plaintiff.
3. Liberty Mutual Insurance Company was the carrier on the risk.
4. On July 31, 1996, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer. Plaintiff contends she injured her lower back and sacroiliac joints, bilaterally. Defendants contend she injured only her lower back.
5. Plaintiff's last day of work for defendant-employer was July 31, 1996, except for one day on which she tried to return to work, without success.
6. Plaintiff's average weekly wage was $134.22, yielding a compensation rate of $89.48.
7. The parties stipulated into evidence a packet of plaintiff's medical records as well as a Stipulation of Evidentiary Record.
 ***********
Based upon all the competent evidence of record, the Full Commission makes the following
 FINDINGS OF FACT
1. At the time of the hearing in this matter, plaintiff was a 26 year old college graduate, born May 12, 1978. Plaintiff's work history consists of waitressing, bartending and housecleaning.
2. The instant claim is the third of three claims filed by plaintiff against employer for incidents occurring on September 4, 1994 (I.C. File No. 479474), June 6, 1996 (I.C. File No. 653440), and July 31, 1996 (I.C. File No. 659629), respectively. These incidents occurred while plaintiff was in the course and scope of and arose out of plaintiff's job as a waitress at Chili's in Asheville.
3. Following the incident of September 4, 1994, acting upon information provided by her mother, plaintiff referred herself to Dr. John Keating of Atlanta, Georgia.
4. After completing a course of physical therapy prescribed by Dr. Keating, plaintiff returned to work with employer without restrictions, performing her regular job duties.
5. Plaintiff did not miss work or seek medical treatment between the June 6, 1996 and July 31, 1996 incidents.
6. Following the July 31, 1996 incident, which is the subject of this claim, plaintiff returned to Dr. Keating and was seen by him on August 5, 1996, December 2, 1996, and February 17, 1997.
7. At the December 2, 1996 office visit, Dr. Keating diagnosed a right sacroiliac joint arthorosis and proposed a surgical percutaneous screw fixation of the sacroiliac joint. He was of the opinion that, following such a procedure, plaintiff should be able to go back to regular function within six weeks and that she would have a 5% whole body permanent partial impairment. Alternatively, without the surgery, Dr. Keating was of the opinion that plaintiff was at maximum medical improvement as of December 2, 1996; that she had a 5%, whole body permanent partial impairment; and that she would be restricted to lifting "35 pounds once and 20 pounds frequently."
8. At the February 17, 1997, office visit, Dr. Keating did not recommend fixation surgery and referred plaintiff to Dr. Alan Lippitt of Atlanta for a second opinion. Dr. Keating was "concerned about proceeding with something as invasive as surgery with an exam that while organic has been at times underwhelming "
9. Plaintiff was treated by Dr. Alan Lippitt of Atlanta, Georgia on February 17, 1997. He recommended she try a "sacroiliac belt" and "prolotherapy" at that time. In prolotherapy, a patient is injected with sclerosing agents (a substance that causes inflammation and scarring) beneath the skin. Plaintiff underwent the prolotherapy but was unable to tolerate it, and it did not improve her condition. Prolotherapy is an extremely controversial therapy, which is not widely accepted. Plaintiff continued to experience symptoms, and on March 26, 1997 when she saw Dr. Lippitt she indicated a desire to undergo surgical percutaneous fixation of her right sacroiliac joint.
10. On June 23, 1997, the instant claim was accepted by defendants as a compensable injury by accident pursuant to a Form 21 agreement.
11. At or about the time defendants accepted the instant claim as compensable, each of the parties agreed to certain conditions, including defendants' agreement to provide treatment for plaintiff at the Bowman-Gray School of Medicine at Wake Forest University and plaintiff's agreement to forego further treatment in Atlanta, Georgia.
12. Prior to August 15, 1997, plaintiff selected Dr. Steven Hughes for her treatment and defendants agreed. At the time, Dr. Hughes was an orthopedic surgeon and assistant professor of orthopedic surgery at the Bowman-Gray School of Medicine at Wake Forest University. Dr. Hughes is currently an assistant clinical professor of orthopedic surgery at Georgetown University School of Medicine.
13. On August 15, 1997, plaintiff was seen by Dr. Steven Hughes. After review of plaintiff's arthrogram, x-rays and an examination, he recommended that plaintiff not undergo further extensive therapies other than pain management. Dr. Hughes was of the opinion that he did not find any of the specific conditions in plaintiff that would, in his medical opinion, justify surgical fixation or fusion of the sacroiliac joint.
14. Dr. Hughes was also of the opinion that plaintiff should be able to return to gainful employment with some work hardening. Dr. Hughes anticipated that, based upon his experience and his examination of plaintiff, she should have been able to return to gainful employment within three to four months of his examination.
15. Dr. Hughes was of the opinion that plaintiff had significant injury to her sacroiliac joint and that there was no active therapy, such as an injection or surgical intervention or other extensive therapy that would significantly ameliorate her symptoms long term. Dr. Hughes has performed fixations and fusions before but did not recommend one for plaintiff because he did not think that she would significantly improve and it would potentially make her worse.
16. On September 29, 1997, plaintiff's counsel filed a Form 33, Request that Claim be Assigned for Hearing, asking that the Industrial Commission issue an Order allowing her to change physicians to Dr. Andrew Rudins at the Southeastern Spine Center in Asheville, citing plaintiff's belief that Dr. Hughes was inadequate.
17. On October 8, 1997, defendants' counsel filed their Response and Objections to Plaintiff's Motion for Change of Physician.
18. On October 29, 1997, defendants' counsel wrote to plaintiff's counsel offering to enroll plaintiff in the Spine Center program at Bowman-Gray under the continuing supervision and care of Dr. Hughes or "some other mutually acceptable physician affiliated with Bowman-Gray."
19. On November 3, 1997, in a letter to defendants' counsel, counsel for plaintiff refused defendants' offer, stating plaintiff's intention to return to Atlanta for care, "with or without (defendants') help." In the same letter, plaintiff's counsel acknowledged plaintiff's prior agreement that she would not return to Atlanta for treatment "at the carrier's expense."
20. Defendants filed their Form 33R on November 14, 1997, incorporating the Response and Objections previously filed.
21. On February 10, 1998, without authorization from defendants and against the recommendations of Dr. Hughes, plaintiff underwent a percutaneous fixation of her right sacroiliac joint, performed by Dr. Lippitt at Georgia Baptist Hospital. Plaintiff was aware that the surgery was not authorized. Following the operation, plaintiff continued under the care and treatment of Dr. Lippitt in Atlanta, without defendants' authorization.
22. On March 10, 1998, before the Industrial Commission had ruled on her first Motion for Change of Physician, plaintiff filed a second Motion for Change of Physician, requesting approval of her past and future treatment with Dr. Alan Lippitt in Atlanta, Georgia.
23. On March 23, 1998, defendants' counsel filed their Response and Objections to Plaintiff's Second Motion for Change of Physician.
24. On July 13, 1998, Tracey H. Weaver, Executive Secretary of the North Carolina Industrial Commission, entered an Order allowing the change to Dr. Lippitt as plaintiff's treating physician only "if defendants have authorized treatment with Dr. Lippitt in the past." Otherwise, "if plaintiff obtained a one-time opinion from Dr. Lippitt at her request and then continued treatment without authorization, then it is ordered that plaintiff's request for a change of treating physicians to Dr. Lippitt is denied at this time and the issue can be determined after the evidentiary hearing." Ms. Weaver further ordered that "in the interim, if the latter is applicable, defendants shall direct plaintiff to a physician besides Dr. Hughes to assume her care."
25. An independent medical examination of plaintiff was arranged by defendants with Dr. Nathan L. Burkhardt of Blue Ridge Bone Joint Clinic in Asheville on August 12, 1998. Due to an apparent miscommunication, plaintiff did not attend the IME on the date scheduled.
26. Throughout 1998 and 1999, plaintiff continued her treatment with Dr. Lippitt without defendants' authorization. On or about August 14, 1998, Dr. Lippitt referred plaintiff to Vicki Sims, a physical therapist. Dr. Lippitt regularly refers patients to Ms. Sims and had referred 37 patients in the last six months at the time of her deposition. Approximately three-fourths of Ms. Sims patients are sacroiliac joint dysfunction cases. After examination of plaintiff, Ms. Sims, a physical therapist, recommended a surgical fusion on the right side and a fixation on the left side of plaintiff's sacroiliac joints.
27. The IME with Dr. Burkhardt was rescheduled for December 2, 1998. Following his examination, Dr. Burkhardt recommended "a firm lumbosacral support, a corset type which would go down to her buttocks and up to waist height, worn firmly but not tightly."
 Dr. Burkhardt also recommended "a psychological evaluation and possibly pain management clinic." Dr. Burkhardt was of the opinion that "any further surgery is extremely guarded," and recommended a second opinion with a spine surgeon "regarding the anticipated fusion of the SI joint." Dr. Burkhardt was of the opinion that plaintiff should be able to perform modest work.
28. On January 5, 1999, defendants' counsel wrote to plaintiff's counsel requesting that plaintiff obtain the second opinion recommended by Dr. Burkhardt and reiterating that plaintiff's treatment in Atlanta was not authorized by defendants.
29. On January 6, 1999, against Dr. Burkhardt's recommendations and in spite of defendants' request for a second opinion with regard to the surgery, plaintiff underwent a bilateral sacroiliac joint fusion performed by Dr. Lippitt at Georgia Baptist Hospital. Ms. Sims, the physical therapist, was present at plaintiff's surgery and set plaintiff's anatomic position.
30. Plaintiff was not deemed by Dr. Lippitt to be at maximum medical improvement for her pelvis until January 26, 2000. At that time, he was of the opinion that plaintiff was still not at MMI for her back. He gave plaintiff an impairment rating of 10% to the back. Approximately two months later, after his deposition had been taken, Dr. Lippitt indicated in a letter to plaintiff's counsel that plaintiff's condition warranted a 12% lower extremity rating for each sacroiliac joint and an additional 12% rating for the back.
31. On March 30, 2000, plaintiff was seen for an IME by Dr. Edward N. Hanley, Jr., the chairman of the Department of Orthopedic Surgery at Carolinas Medical Center in Charlotte. Following his examination of plaintiff and a review of her history and treatment records,
 Dr. Hanley was of the opinion that plaintiff was not an appropriate candidate for the fixation and fusion surgeries she had undergone. He opined that "the vast majority of doctors involved in the care of patients with conditions such as this do not do, nor do they advocate this type of diagnosis and treatment." "In an institution like .Carolinas Medical Center, where they do thousands of orthopedic operations a year, there would be no sacroiliac fusions done for such conditions. The conditions under which such diagnosis and treatment would be appropriate, in Dr. Hanley's opinion, would be "rarely in women after childbirth, after traumatic injuries where there have been pelvic fractures of severe high energy injuries automobile accidents or falls from great heights and the pelvis is fractured, the joint is actually ripped apart." In Dr. Hanley's experience and based upon his review of plaintiff's history, these conditions were not present in plaintiff nor would they be consistent with her history.
32. Dr. Hanley would have recommended physical therapy for plaintiff instead of the fixation and fusion surgeries she underwent. Based upon his experience with similarly situated patients, following the course of conservative treatment he would recommend, "(p)atients are usually able to participate in sedentary or light work for a period of a few years and then with gradual improvement can get to the point of no restrictions."
33. With regard to the prolotherapy recommended by Dr. Lippitt, which Dr. Hanley defined as an" extremely controversial method of treating painful musculoskeletal conditions with injection of sclerosing agents (a substance that causes inflammation and scarring) beneath the skin," Dr. Hanley has seen a number of patients who had been treated with it, and he does not think it works. Plaintiff indicated to Dr. Hanley that the prolotherapy she received through Dr. Lippitt made her condition worse.
34. With respect to her current level of permanent impairment, Dr. Hanley was of the opinion that plaintiff has a 20% permanent impairment to the spine, a portion of which is solely attributable to the bilateral fusion of her sacroiliac joint. Without such surgery and with the conservative treatment he would have recommended, he would have expected plaintiff's level of permanent impairment to be in the 5% to 10% range. The rest of her rating is attributable directly to her surgeries.
35. Dr. Hanley is of the opinion that plaintiff had reached overall MMI as of March 30, 2000, the date he examined her, and that she was capable of sedentary work.
36. The opinions of Dr. Hughes and Dr. Hanley are given greater weight than the opinion of Dr. Lippitt and Ms. Sims.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following
 CONCLUSIONS OF LAW
1. The medical care sought and obtained by plaintiff through Dr. Alan Lippitt in Atlanta, Georgia, including but not limited to that of Ms. Sims, was not reasonably necessary to effect a cure, give relief, or lessen the period of disability. Based upon competent medical evidence, the treatment sought by plaintiff through Dr. Lippitt may have actually extended her period of disability and increased her level of permanent impairment. N.C. Gen. Stat. §§ 97-2(19); 97-25.
2. Plaintiff's treatment through Dr. Lippitt was not authorized. Therefore, plaintiff is not entitled to the Industrial Commission's approval of her change of physician to Dr. Lippitt, she is not entitled to compensation for charges arising from or related to the treatment provided by or through Dr. Lippitt, she is not entitled to temporary total disability compensation for the period during which her disability was extended by such treatment, nor is she entitled to compensation for the increase in her level of permanent impairment caused by such treatment. N.C. Gen. Stat. §§ 97-2(19); 97-25; Hyler v. GTE Products Company,333 N.C. 258, 425 S.E.2d 698 (1993).
3. Plaintiff retains a 10% permanent partial disability as a result of her July 31, 1996 compensable injury. Plaintiff is entitled to have defendants pay permanent partial disability compensation at the rate of $89.48 per week for a period of 30 weeks. N.C. Gen Stat. § 97-31.
4. Defendants are entitled to credit for payments made when not due and payable. N.C. Gen. Stat. § 97-42.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Approval of plaintiff's change of physician to Dr. Alan Lippitt of Atlanta, Georgia is hereby DENIED.
2. Plaintiff shall be responsible for all charges arising from or related to the treatment provided by or through Dr. Lippitt.
3. Defendants shall be entitled to credit for payments made from December 15, 1997 through March 30, 2000. This credit is to be applied to future temporary total disability compensation to which plaintiff is entitled and has been reinstated as of March 30, 2000, and against the amount of future compensation to which plaintiff is entitled for permanent partial disability.
4. When temporary total disability ends, subject to the credit set forth above, plaintiff is entitled to permanent partial disability compensation to plaintiff for a 10% permanent partial impairment to the back.
5. A reasonable attorney's fee of 25% is hereby approved for plaintiff's counsel and shall be deducted from sums owed to plaintiff by defendants and to be paid directly to plaintiff's counsel.
6. Each side shall bear its owns costs; however, defendants shall pay expert witness fees as follows, if the same have not previously been paid: an expert witness fee in the amount of $350.00 for Dr. Hanley, an expert witness fee in the amount of $700.00 for Dr. Hughes, an expert witness fee in the amount of $225.00 for Dr. Jensen, an expert witness fee in the amount of $350.00 for Dr. Lippitt and an expert witness fee in the amount of $200.00 for Ms. Sims.
This the 26th day of June 2003.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER